1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

7  UNITED STATES OF AMERICA,          )
8                          Plaintiff,  )          Case No. 2:06-cr-00280-RCJ-PAL
9  vs.                                 )          <u>**REPORT OF**</u>
10 BROSE ROBERTS,                      )          <u>**FINDINGS AND RECOMMENDATION**</u>
11                         Defendant.   )          (M/Suppress - #18)
   _____      )
12

13         Before the court is defendant's Motion to Suppress Evidence for Fourth Amendment and Fifth
14  Amendment Violations (#18) which was referred to the undersigned for findings and recommendation
15  pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-3 and IB 1-4.  The court has considered the motion,
16  the government's Opposition (#19), defendant's Reply (#21), and the testimony adduced at an
17  evidentiary hearing conducted October 26, 2006.

18                                    <u>**BACKGROUND**</u>

19         The defendant, Brose Roberts ("Roberts"), is charged by way of an indictment returned
20  August 1, 2006 with felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and
21  924(a)(2).  The indictment also contains a forfeiture allegation.  The indictment arises out of Roberts'
22  arrest on February 3, 2006 by officers of the Las Vegas Metropolitan Police Department ("LVMPD")
23  on the corner of Rosanna and O'Bannon in Las Vegas, Nevada.  Roberts' motion to suppress argues his
24  Fourth Amendment rights were violated when he was detained without reasonable suspicion.  Roberts
25  contends he was seized in an investigatory detention without reasonable suspicion when he was told to
26  approach an officer and her patrol vehicle.  He also argues the officer did not have reasonable suspicion
27  to believe he was armed and dangerous to conduct a pat down of his person which revealed the
28  presence of the weapon he seeks to suppress here.  Roberts asserts that under the totality of the

1   circumstances, his detention escalated into an unconstitutional arrest because it was not based on

2   probable cause.  He also contends his Fifth Amendment rights were violated when he was subjected to

3   custodial interrogation after *Miranda* warnings were administered when he declined to answer a

4   question and the interrogating officer did not scrupulously honor his right to remain silent.  Thus, under

5   the "fruit of the poisonous tree" doctrine, the firearm, ammunition, and his statements must be

6   suppressed.

7        The government opposes the motion, asserting Officer Griffin's initial contact with Roberts was

8   not a seizure.  Alternatively, if the court believes Roberts was seized during the initial encounter, the

9   government asserts Roberts was subjected to an investigatory detention based on reasonable suspicion.

10  The government argues that during the initial encounter, there was "an abrupt change in the status quo"

11  that created reasonable suspicion to conduct a pat down search for weapons.  The government disputes

12  that the investigatory detention escalated into a full-blown arrest when Officer Griffin drew her firearm

13  and handcuffed Roberts.  Finally, the government concedes that Roberts declined to answer one of

14  Officer Griffin's questions, but disputes that Roberts invoked his right to remain silent.

15       Roberts replies Officer Griffin lacked reasonable suspicion to conduct an investigatory detention

16  under the totality of the circumstances presented because the 311 non-emergency call that initiated the

17  police response lacked sufficient indicia of reliability.  Roberts concedes that the 311 caller identified

18  himself and his location, making himself vulnerable to possible criminal sanction for a false report, and,

19  therefore, satisfying the first and third factors under the Ninth Circuit's decision in United States v.

20  Terry-Crespo, 356 F.3d 1170 (9th Cir. 2004).  However, he argues that because the 311 was a non-

21  emergency call, and provided only general and vague information of potential criminal activity, the tip

22  should not be regarded as reliable under the second and fourth factors articulated in Terry-Crespo.

23  Additionally, he points out that the court in Terry-Crespo recognized the heightened reliability of a 911

24  emergency call.  Roberts acknowledges that under Terry, a law enforcement officer may conduct a pat

25  down search for weapons if she has reasonable suspicion to believe a suspect is armed and dangerous,

26  but disputes Officer Griffin had reasonable articulable facts to suggest he was armed and dangerous.

27  Additionally, Roberts argues that the intrusiveness of the stop and methods used by the police elevated

28  the Terry investigatory detention into a full-scale arrest without probable cause.  Finally, Roberts argues

2

1  he invoked his right to remain silent when he told Officer Griffin he did not want to answer her

2  question about where he obtained the firearm.  Thus, Officer Griffin violated his Fifth Amendment

3  rights when she continued to question him about the firearm after he attempted to cut off all

4  questioning.

5        At the evidentiary hearing, the government called Officer Virginia Griffin, played the 311

6  recording and rested.  Roberts did not call any witnesses.

7  **Testimony of Virginia Griffin**

8        Officer Griffin has been a patrol officer for LVMPD for almost twelve years.  On February 3,

9  2006, she was on patrol in uniform in a marked patrol car and responded to a call at the intersection of

10  O'Bannon and Rosanna in Las Vegas, Nevada.  She was driving southbound on Rosanna and as she

11  approached, she observed a white Firebird parked on the southeast corner and a man standing to the rear

12  of the vehicle.  The information she received from dispatch which caused her to respond to the call was

13  suspicious activity around a white Camaro or Firebird.  Dispatch advised there were approximately five

14  individuals possibly stripping the vehicle or engaging in a drug deal.  Griffin advised dispatch that she

15  had arrived and gave a description of the man she saw, made a u-turn, and tactically parked.  She was

16  alone when she initiated contact with the man she observed.  The man was bald, wearing a black jacket

17  and red shirt, black shorts, approximately 6'0" and 200 pounds.  She identified Roberts as the individual

18  with whom she made contact, in open court.  She arrived at approximately 7:50 to 8:00 a.m.

19        She got out of her patrol car and stood by the driver's side door and said, "Hi, sir.  Can I talk to

20  you for a moment?"  Roberts responded by asking why he needed to speak with her.  Griffin advised

21  Roberts that she had been called because of suspicious activity regarding the vehicle and reiterated that

22  she needed to speak with him.  The vehicle matched the description she received from dispatch.  Griffin

23  asked Roberts to step toward her.  She saw an item, a bag or something next to the vehicle, but could

24  not determine what it was.  Roberts had his hands in his pockets, and she asked him to please take his

25  hands out of his pockets.  Roberts complied.  Griffin reiterated that she just needed to speak with him

26  and "please come towards my vehicle."  Roberts kept questioning her about why she needed to talk to

27  him.  Roberts put his hands back in his pockets, and she again asked him to take his hands out of his

28  pockets.  Roberts took his hands out of his pockets, but put his hands back in his pockets three or four

times.  Griffin told him that "it was a very bad day for him to keep putting his hands in his pockets" and that for her safety, she wanted him to keep his hands out of his pockets.  Roberts slowly approached her vehicle while looking down and coming around the corner of his vehicle.  He had not yet made it to her patrol vehicle when the second officer arrived.  She described Roberts as hesitant, looking up and down, and not complying with her orders to keep his hands out of his pockets and to approach her.  Officer Kingsley arrived and walked to the front of her patrol vehicle.  When Kingsley arrived, Roberts was approximately four to five feet away from her.  Griffin went around her patrol vehicle to establish a tactical position on the other side of Roberts while waiting for dispatch to return information on the license plate.  She circled to the east of Roberts.  She asked if this was his vehicle, and he responded affirmatively.

When asked whether she had any concerns about Roberts, Griffin testified that he was acting very suspicious.  He was putting his hands back in his pockets after she had asked him three or four times to keep his hands visible for her safety.  A weapon can easily be concealed in a pocket.  Roberts was wearing a large heavy, bulky jacket, and she did not know whether he had a weapon concealed.  Griffin asked Roberts whether he had any guns or weapons on his person.  Roberts looked up from the ground and said no.  She was concerned about Roberts having the gun because he was not listening to her commands, he was very nervous, he was looking at the ground, not making eye contact, and kept putting his hands back in his pockets.  She testified, "His body language wasn't right."

She told Roberts to step up toward her patrol vehicle and that she was going to pat him down for weapons.  Roberts looked up from the ground and immediately turned at an angle and raised his right foot up and right arm up and said, "No, you're not going to search."  At this point, she drew her weapon.  She drew her weapon because she was concerned by Roberts' actions and because when she initially made contact with him, indicating she needed to talk with him, Roberts immediately responded, "Why do you have to search me?"  She thought his comment was odd under the circumstances.  As Roberts slowly walked toward her during the initial contact, she responded, "I'm not going to search you yet," and reiterated that she just needed to speak with him.  She pulled her weapon because Roberts was taking an aggressive stance by positioning himself at a forty-five degree angle toward her, raising his foot and right hand.  She had no idea what was in his pocket, and drew her

4

weapon for officer safety reasons.  She estimated she was three to five feet from Roberts at the time she drew her weapon.  Griffin is five feet tall and weighs approximately 115 pounds.  When she drew her weapon, Roberts moved two to three feet toward her patrol car and put his hands out.  She holstered her weapon and with Kingsley acting as cover, she went behind Roberts, placed him in handcuffs, and patted him down.  As she handcuffed his right hand, she looked forward into his right pocket and could see the weapon.  She pulled the weapon out and advised Officer Kingsley that she had recovered a firearm.  It was a .38 caliber firearm and fully loaded.

She advised Roberts of his *Miranda* rights, and he indicated he understood those rights.  She initially asked if the firearm was his weapon.  Roberts responded no.  She asked Roberts where he got the weapon, and Roberts responded that he would not like to answer that question.  She then asked why he was carrying a weapon, and Roberts said "because there are bad people who want to hurt me."

The area where this encounter occurred is a public area with homes on half-acre lots with frontage roads on the front and on the side of some of the homes.  There were no other citizens in the area while she made contact with Roberts.  After Roberts was in custody, she ran the license plates and confirmed that they came back to Roberts.  She learned that the car was registered to Roberts after he engaged in the actions with his hands she described on the record.

On cross examination, Griffin testified she wrote an arrest report to memorialize the events which was checked by her supervisor.  She reviewed the report to refresh her recollection before court.  Another purpose of writing reports is to test an officer's credibility.  She was dispatched to this intersection on February 3, 2006 because of a report a vehicle was possibly being stripped or there was a drug deal.  She was told that there were initially possibly up to five individuals, but that some of them had left the area.  Some of the individuals were wearing white shirts and blue jeans, and some had their caps on backwards.  She was told there were three to five individuals, one of whom was female.  She had no other information from the dispatcher regarding their wardrobe.  The car she observed when she arrived was similar to the one reported by dispatch.  She had a good view on one side of the vehicle, but was not able to see the other side.  From her standpoint, she did not observe a broken window, and she could not confirm or see whether any chrome had been taken off the vehicle.  It did not appear that anyone was trying to take the tires off from what she could see.  She saw nothing to indicate the car was

1   being stripped.  When she arrived, Roberts was the only individual she could see at the scene.

2   Roberts was not talking with anyone or dealing with anyone when she first observed him.  She did not

3   see anything to lead her to believe Roberts was engaged in drug dealing.

4           When she arrived, she asked Roberts to come over.  Roberts was just standing there.  He

5   "hesitantly" complied with her request to come over.  She asked him several times to take his hands out

6   of his pockets.  On each occasion, he did.  Roberts was doing everything she requested "hesitantly."

7   During the initial encounter, Roberts was twenty to thirty feet or less from her patrol car, possibly

8   twenty feet away.  In the short span of approximately twenty feet, he took his hands in and out of his

9   pockets three or four times.

10          Roberts was wearing a black jacket, a red shirt, and black shorts, nothing like the description of

11  the individuals she received from dispatch.  She initially told Roberts she needed to talk with him.  She

12  did not say anything about searching him "yet."  She did not agree with defense counsel that her use of

13  the word "yet" implied she was eventually going to search Roberts.  Roberts said he did not want to be

14  searched.  When she first saw Roberts, he was standing next to the vehicle in a residential area with

15  frontage roads bordering half-acre homes, and it had not yet been determined whether the vehicle was

16  stolen.  When she first saw Roberts, she had no idea whether the vehicle was stolen, or what was

17  occurring.  She did not receive a dispatch report that the vehicle was stolen.  However, the dispatcher

18  reported a vehicle was possibly being stripped, and "usually they strip stolen vehicles."

19          Roberts' hands were out of his pockets when he took an aggressive stance toward her,

20  positioned himself at a forty-five degree angle, and raised his hand up.  When someone "squares off," it

21  does not necessarily mean they are facing directly forward.  When she uses the term "squaring off," she

22  refers to a person looking directly at her, but that does not mean their feet cannot be positioned in a

23  stance at a forty-five degree angle.

24          As Roberts started to approach her patrol car, Officer Kingsley had just arrived.  She did not

25  know whether Kingsley had gotten out of his patrol car by the time Roberts started to approach her.

26  She and Roberts had words back and forth.  She initially asked him to come around his vehicle and

27  walk toward her.  Roberts was not initially complying.  Griffin was watching Roberts and was not

28  aware of at what point Kingsley got out of his vehicle.  She was aware of Kingsley's arrival a moment

1   or two after she made contact with Roberts.  She estimated she was alone with Roberts at the most for

2   one minute.  Kingsley was out of his vehicle and on the scene before Roberts approached her patrol

3   vehicle.  Roberts was five or six feet from her patrol vehicle when Kingsley approached her.  When she

4   made the statement she was not going to search Roberts yet, she was alone with Roberts.  Kingsley had

5   not yet arrived.  At the time she decided to pat down Roberts, his right hand was out of his pocket.  The

6   right hand pocket is where she recovered the gun.  She did not write in her report, or testify that she saw

7   any bulges in the jacket.  Roberts was wearing a large bulky jacket.  She could not see any bulges.  Both

8   hands had been in the jacket, and she could not tell if he was concealing a weapon.

9        On redirect examination, she reiterated that the report from dispatch indicated there was a white

10  male and female out in front of the residence and up to five possible other subjects, some of whom were

11  wearing white t-shirts and blue jeans.  She had no other description.  In the area where the stop

12  occurred, there have been a lot of recovered stolen vehicles.  Stripping vehicles involves both the

13  interior and exterior of the vehicle.  She could not tell on her initial encounter with Roberts whether the

14  vehicle had been stripped from her vantage point.  On recross examination, Griffin testified she could

15  not see into the vehicle to determine whether it had been stripped, or whether there was any tampering

16  to the interior of the vehicle.  There was no indication the vehicle had been stripped, but she could only

17  see the exterior of the car on the driver's side.  She had no view of the passenger side.

18       In response to the court's inquiries, Griffin testified approximately three or four minutes elapsed

19  from the time that she first made contact with Roberts from behind the door of her patrol vehicle until

20  she drew her weapon.  She estimated it was approximately a minute and a half until Officer Kingsley

21  arrived and that another minute and a half elapsed before she drew her weapon.  She initially asked

22  rather than commanded Roberts to talk with her, testifying "I always ask."  When she got out of her

23  patrol car, she was concerned because of reports from dispatch that there were other individuals

24  involved.  The residence on the corner where the car was parked was a "high activity area" with "a lot

25  of comings and goings" from that house.  She had been told by other officers who worked the area that

26  it was a "problem residence."  She was told of drug and prostitution activity from that residence, and

27  that the person who was renting the house was a "problem to the area."  Roberts was right on the side of

28  the "problem house."  When Griffin initially asked Roberts if she could talk to him, Roberts responded,

"Why?"  Griffin told Roberts that she was there investigating and had been called there, and again said she just needed to speak with him for a moment.  She asked Roberts to come over to her vehicle so that they could talk, and Roberts again asked, "Why do I have to talk with you?"  She kept stating she just needed to talk with him, and explained what the call was about, basically that there was a suspicious vehicle.  Roberts turned slowly toward her, and "then, we had the problem with the hands in the pockets."  She kept telling him, "Sir, please keep your hands out of your pockets."  She was concerned for her safety because she could not see exactly what was sitting down on the ground near the vehicle. She could see there was a bag or something else on the ground and wanted Roberts to step back from the vehicle so she could see him "in full."  As Roberts started to approach her, she told him about a suspicious activity report of stripping the vehicle, and Roberts said, "Why do you have to search me?" She responded that she had not said anything about searching him "yet" and just wanted to speak with him.  That is when Roberts slowly started approaching her.  Roberts was five or six feet away from her when Officer Kingsley approached.

### The 311 Recording

At the conclusion of Officer Griffin's testimony, the audio recording of the 311 call which prompted this incident was played.  The call was made at approximately 7:48 a.m. on February 3, 2006. The caller, Jeff Keys, stated he lived at 2201 Rosanna and that on the corner of Rosanna and O'Bannon, there was a very suspicious situation.  He stated a car was either being stripped or a drug deal was going on.  The caller did not want to get close and "spook them."  He described the car as a white Camaro or Firebird that was right on the corner.  He indicated he had lived there for fifteen years, "and this kind of thing don't happen here."  He reiterated that it was very suspicious and that the individuals were very nervous.  He stated there were two white people and one female, but did not know whether she was Hispanic or white.  The caller offered to give the dispatcher his cell number so that he could keep watching and report additional information.  He gave the dispatcher his cell phone number, again identified himself, and where he lived.  The dispatcher advised the caller that the police were on the way.  The dispatcher asked for a description of the individuals.  He stated there were three and as many as five people in and out, wearing white t-shirts, blue jeans, and baseball caps on backwards.  The caller stated that he did not know where they were coming from and did not want to come out of his cul-de-

1    sac so that they would see him.  The caller stated that he had gone out in his robe when his neighbor

2    reported something was suspicious, that he was getting dressed to go back out.  The caller asked the

3    dispatcher whether he should go back out.  She responded that it was up to him, but she did not want

4    him to place himself in danger.  She advised the caller that the police were on their way, and the call

5    ended.

6                                          **DISCUSSION**

7            The Fourth Amendment secures "the right of the people to be secure in their persons, houses,

8    papers, and effects against unreasonable searches and seizures."  U.S. Const. amend. IV.  The Fourth

9    Amendment protects reasonable and legitimate expectations of privacy.  Katz v. United States, 389 U.S.

10   347 (1967).  The Fourth Amendment protects "people not places."  Id.  Evidence obtained in violation

11   of the Fourth Amendment, and evidence derived from it may be suppressed as the "fruit of the

12   poisonous tree."  Wong Sun v. United States, 371 U.S. 471 (1963).

13           **A.        Standard of Review**

14           In determining whether a Fourth Amendment violation has occurred, and, if so, whether

15   suppression is warranted, the court begins its analysis with the question of whether the encounter

16   between Roberts and Officer Griffin was a seizure.  Not all contacts between policemen and citizens

17   involve seizures for purposes of the Fourth Amendment.  Only when an officer, by means of physical

18   force or show of authority, has in some way restrained the liberty of a citizen does a seizure occur.

19   Terry v. Ohio, 392 U.S. 1, 19, n.16 (1968).  Fourth Amendment jurisprudence recognizes three levels of

20   contact between law enforcement officers and citizens: (1) consensual encounters, (2) investigatory

21   detentions, and (3) arrests.  A consensual encounter is not a seizure within the meaning of the Fourth

22   Amendment.  However, investigatory detentions and arrests are seizures.  The Ninth Circuit reviews a

23   district court's grant or denial of a motion to suppress de novo.  United States v. Reid, 226 F.3d 1020,

24   1025 (9th Cir. 2000).  The district court's factual findings are reviewed for clear error.  United States v.

25   Fernandez-Castillo, 324 F.3d 114, 117 (9th Cir. 2003).  The Court of Appeals reviews whether an

26   encounter between an individual and a law enforcement officer is a seizure de novo as a mixed question

27   of law and fact.  United States v. Cormier, 220 F.3d 1103, 1110 (9th Cir. 2000).

28   / / /

## B.   Initial Encounter

Roberts argues he was seized and detained without reasonable suspicion during his initial contact with Griffin.  The government contends the initial contact between Griffin and Roberts was not a seizure, but argues in the alternative Griffin had reasonable suspicion to detain and question Roberts.

For Fourth Amendment purposes, a seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen."  Terry, 392 U.S. at 19, n.16.  Justice Stewart's opinion in United States v. Mendenhall, 446 U.S. 544 (1980), developed what the courts have referred to as the *Mendenhall* test for when a seizure occurs: "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  Id. at 554.  If a reasonable person would feel free "to disregard the police and go about his business," the encounter is consensual and no reasonable suspicion is required.  California v. Hodari D, 499 U.S. 621, 628 (1991).  "The Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation."  Florida v. Bostick, 501 U.S. at 439.

However, the mere fact that an individual encountering a police officer does not feel free to leave does not mean a seizure has occurred.  Id. at 435.  In Bostick, the Supreme Court explained that where Bostick's freedom of movement was restricted by a factor independent of police conduct – *i.e.,* because he chose to take the bus and may have feared that if he disembarked, the bus would leave without him – the "free to leave" analysis was inapplicable.  The court held: "in such a situation, the appropriate inquiry is whether a reasonable person would feel free to decline the officer's request or otherwise terminate the encounter."  Id.  The "reasonable person" test is an objective one and presupposes an *innocent* person.  Id. at 438 (emphasis in original).  Thus, the court held:

> . . . in order to determine whether a particular encounter constitutes a seizure, a court must consider all of the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

Id. at 439.

1    "A seizure does not occur if an officer applies physical force in an attempt to detain a suspect

2    but such force is ineffective."  United States v. Hernandez, 27 F.3d 1403, 1407 (9th Cir. 1994), citing

3    Hodari D, 499 U.S. at 625.  Similarly, a seizure does not occur for Fourth Amendment purposes when

4    an officer makes a show of authority to which the subject does not yield.  Hodari D, 499 U.S. at 627.

5    There, the Supreme Court clarified that the *Mendenhall* test for when a person has been seized within

6    the meaning of the Fourth Amendment does not mean that whenever a show of force is made a person

7    has been seized.  The *Mendenhall* test to determine when a "show of authority" constitutes a seizure is

8    an objective one.  Id.  It does not mean that "whenever" a show of authority has been made a person is

9    seized.  Rather, although a show of authority is a necessary condition, it is not sufficient in and of itself

10   to constitute a seizure.  The *Mendenhall* objective test is "not whether the citizen perceived that he was

11   being ordered to restrict his movement, but whether the officer's words and actions would have

12   conveyed that to a reasonable person."  Id.  If an officer's "show of authority" does not produce a stop,

13   no seizure has occurred.

14       In Hodari D, the Supreme Court explained that the exclusionary rule does not apply to an

15   officer's unlawful show of authority, reasoning:

16              Unlawful orders will not be deterred, moreover, by sanctioning through

17              the exclusionary rule those of them that are *not* obeyed.  Since policemen

18              do not command "Stop!" expecting to be ignored, or give chase hoping to

19              be outrun, it fully suffices to apply the deterrent to their genuine,

20              successful seizures.

21   Id. (emphasis in original).

22              **1.    Consensual Encounters**

23       The Supreme Court has long held that police may stop a citizen at any time, request

24   identification and other information, and even request permission to search so long as a reasonable

25   innocent person in the citizen's position recognizes that he or she is free to leave or terminate the

26   encounter.  Terry, 392 U.S. at 1; Florida v. Royer, 460 U.S. 491 (1983); Florida v. Rodriguez, 469 U.S.

27   1 (1984) (*per curiam*); I.N.S. v. Delgado, 466 U.S. 410 (1984).  Moreover, "police officers can

28   approach individuals as to whom they have no reasonable suspicion and ask them potentially

11

1  incriminating questions." <u>Bostick</u>, 501 U.S. at 437.  The Supreme Court has repeatedly held that "mere

2  police questioning does not constitute a seizure." <u>Id.</u>

3          In <u>United States v. Drayton</u>, the Supreme Court reaffirmed its prior holdings that:

4                  Law enforcement officers do not violate the Fourth Amendment's

5                  prohibition of unreasonable seizures merely by approaching individuals

6                  on the street or in other public places and putting questions to them if

7                  they are willing to listen.

8  536 U.S. 199, 200 (2002), <u>citing</u> <u>Royer</u>, 460 U.S. at 497 (1983), and <u>Rodriguez</u>, 469 U.S. at 5-6.  There

9  is no seizure, for purposes of the Fourth Amendment "when police ask questions of an individual, ask

10  to examine the individual's identification, and request consent to search his or her luggage – so long as

11  the officers do not convey a message that compliance with their request is required." <u>Bostick</u>, 501 U.S.

12  at 437.  Or, as the Supreme Court reiterated in <u>Drayton</u>, "[e]ven when law enforcement officers have no

13  basis for suspecting a particular individual, they may pose questions, ask for identification, and request

14  consent to search luggage – provided they do not induce cooperation by coercive means . . . If a

15  reasonable person would feel free to terminate the encounter, then he or she has not been seized." 536

16  U.S. at 201 (internal citation omitted).  A citizen's encounter with a police officer "will not trigger

17  Fourth Amendment scrutiny unless it loses its consensual nature." <u>Id.</u>

18          **2.**    **Investigatory Detentions**

19          The second level of contact recognized by Fourth Amendment jurisprudence is commonly

20  referred to as a *Terry* stop, or an investigatory detention.  The Fourth Amendment requires that a *Terry*

21  stop be supported by "reasonable suspicion" that criminal activity may be afoot.  <u>United States v.</u>

22  <u>Arvizu</u>, 534 U.S. 266, 273 (2002).  In assessing whether an officer has reasonable suspicion to conduct

23  an investigatory detention, reviewing courts look at the "totality of the circumstances" of each case to

24  see whether the detaining officer had a "particularized and objective basis" for suspecting legal

25  wrongdoing.  <u>Arvizu</u>, 534 U.S. at 273.  "An investigatory stop must be justified by some objective

26  manifestation that the person stopped is, or is about to be, engaged in criminal activity." <u>United</u>

27  <u>States v. Cortez</u>, 449 U.S. 411, 417 (1981).  A reviewing court's determination of reasonable suspicion

28  is a process that "allows officers to draw on their own experience and specialized training to make

1 inferences from and deductions about the cumulative information available to them that 'might well

2 elude an untrained person.'" Arvizu, 534 U.S. at 273, citing Cortez 449 U.S. at 418.  The Fourth

3 Amendment is satisfied if an officer's action is supported by reasonable suspicion to believe that

4 criminal activity may be afoot, and observation of factors which are by themselves consistent with

5 innocence may collectively amount to reasonable suspicion.  Id. at 273-74.  Reasonable suspicion is not

6 a matter of hard certainties, but of probabilities.  Cortez, 449 U.S. at 417-18.  However, reasonable

7 suspicion requires more than an officer's "hunch" even if the hunch later turns out to be a good one.

8 Terry, 392 U.S. at 27.  The reasonable suspicion standard is less than a preponderance of the evidence.

9 United States v. Sokolow, 491 U.S. 1, 7 (1989).

10          In Adams v. Williams, the Supreme Court explained its holding in Terry as follows:

11                    In Terry, this Court recognized that a police officer may in appropriate

12                    circumstances and in an appropriate manner approach a person for

13                    purposes of investigating possible criminal behavior even though there

14                    was no probable cause to make an arrest.  The Fourth Amendment does

15                    not require a policeman who lacks the precise level of information

16                    necessary for probable cause to simply shrug his shoulders and allow a

17                    crime to occur or a criminal to escape.  On the contrary, Terry recognizes

18                    that it may be the essence of good police work to adopt an intermediate

19                    response.

20                    A brief stop of a suspicious individual, in order to determine his

21                    identity or to maintain the status quo momentarily while obtaining more

22                    information, may be most reasonable in light of the facts known to the

23                    officer at the time.

24 407 U.S. 143, 145-147 (1972) (citations omitted).

25          Reasonable suspicion to conduct an investigatory detention may be provided by a tip of an

26 informant if that tip contains sufficient indicia of reliability.  Id. at 147.  A tip without sufficient indicia

27 of reliability will not justify a Terry stop.  Florida v. J.L., 529 U.S. 266, 270-72 (2000).  An unverified

28 tip from a known informant may be sufficiently reliable to justify a Terry stop and frisk.  Adams, 407

1    U.S. at 147.  A third party report of suspected criminal activity may establish reasonable suspicion if the

2    report possesses sufficient indicia of reliability.  Fernandez-Castillo, 324 F.3d at 117.  A report from a

3    known source, made contemporaneously with the informant's observation, an officer's discovery of the

4    car described by the dispatcher within minutes of the report, and an officer's independent observations

5    tending to corroborate the report create reasonable suspicion.  Id. at 117-18, n.3, 122-23.

6         A 911 emergency call is entitled to greater reliability than a tip concerning general criminality.

7    Terry-Crespo, 356 F.3d at 1176.  There, the court held the officer had reasonable suspicion to conduct a

8    Terry stop where a 911 caller, who identified himself, reported that he had been threatened with a gun

9    by a man he described.  A police officer was dispatched to the location the caller reported, arrived on

10   the scene within thirty seconds and spotted a man who fit the description provided.  The officer got out

11   of his patrol vehicle, drew his gun, pointed it at the suspect and told him to put his hands up and not

12   move.  When a backup officer arrived, the suspect was handcuffed and patted down.  During the pat

13   down, a .45 caliber semi-automatic handgun fell from the suspect's waistband to the ground, and he

14   was arrested.  The Ninth Circuit held that the 911 call standing alone had sufficient indicia of reliability

15   to provide reasonable suspicion for the stop and frisk.

16        An officer may frisk an individual for weapons where she has reason to believe that she is

17   dealing with an armed and dangerous individual.  Terry, 392 U.S. at 27.  Terry held:

18            . . . where a police officer observes unusual conduct which leads him

19            reasonably to conclude in light of his experience that criminal activity

20            may be afoot and that the persons with whom he is dealing may be armed

21            and presently dangerous, wherein the course of investigating this behavior

22            he identifies himself as a policeman and makes reasonable inquiries, and

23            where nothing in the initial stages of the encounter serves to dispel his

24            reasonable fear for his own or others' safety, he is entitled for the

25            protection of himself and others in the area to conduct a carefully limited

26            search of the outer clothing of such persons in an attempt to discover

27            weapons which might be used to assault him.

28   Id. at 30.

14

1    The Ninth Circuit has "identified a wide variety of factors that can support a reasonable belief

2    that an individual is armed." United States v. Flatter, 456 F.3d 1154, 1157 (9th Cir. 2006). Significant

3    weight is given to an officer's observation of a visible bulge in an individual's clothing that could

4    indicate the presence of a weapon. Id. Sudden movements, or repeated attempts to reach for an object

5    that is not immediately visible may give rise to a reasonable suspicion a defendant is armed. Id. at

6    1158. The nature of the crime suspected, and whether it is associated with weapons may create

7    reasonable suspicion for a pat down search. Id. However, to comport with the Fourth Amendment, a

8    police officer must have more than a reasonable belief that *if* the individual with whom contact is made

9    is armed, he or she would be dangerous. Id.

10              **3.    Arrests**

11   The third, and most intrusive level of contact between a citizen and a police officer is an arrest.

12   An arrest is a seizure which must be supported by probable cause. Adams, 407 U.S. at 148-49. There

13   is no bright line rule for determining when an investigatory detention is converted into a full fledged

14   arrest. United States v. Sharpe, 470 U.S. 675, 685 (1985). The determination of whether a *Terry* stop

15   has been converted into a full fledged arrest requires an examination of the totality of the circumstances

16   surrounding the encounter, and each case must be decided on its own facts. United States v. Parr, 843

17   F.2d 1228, 1231 (9th Cir. 1988). "Pointing a weapon at a suspect, ordering him to lie on the ground,

18   handcuffing him, and placing him for a brief period in a police vehicle for questioning – whether singly

19   or in combination – does not automatically convert an investigatory detention into an arrest requiring

20   probable cause." Allen v. City of Los Angeles, 66 F.3d 1052, 1056 (9th Cir. 1995). "The use of force

21   in making a stop will not convert the stop into an arrest 'if it occurs under circumstances justifying fears

22   for personal safety.'" Id., quoting United States v. Jacobs, 715 F.2d 1343, 1345-46 (9th Cir. 1983).

23              **ANALYSIS**

24   To decide the motion, the court must apply these principles to the totality of the circumstances

25   presented in the record. Roberts argues that because he was unlawfully detained without reasonable

26   suspicion, the firearm recovered from his person must be suppressed. During oral argument following

27   the hearing, counsel for Roberts suggested the court could find he was unlawfully detained at various

28   points of his encounter with Officer Griffin. Counsel for Roberts argued that Roberts was detained

1   from the point of his initial contact with Griffin because Griffin insisted on speaking with him over his

2   objection.  Alternatively, counsel suggested that Roberts was detained from the point Griffin asked

3   Roberts to approach her patrol car.  Counsel for Roberts argued that Roberts was seized because he was

4   compliant and cooperative with Griffin, took his hands out of his pockets three or four times as ordered,

5   and was walking toward her patrol car before she drew her weapon.  Counsel conceded that the 311

6   non-emergency call was sufficient to require the police to investigate.  However, he asserted that when

7   Griffin arrived at the location described, and Roberts did not match the description of the individuals

8   reported, and was not observed doing anything to suggest he was dealing drugs or stripping the car,

9   Griffin lacked reasonable suspicion to detain.  Counsel argued that even if the court found Roberts was

10  not detained until Griffin drew her gun, reasonable suspicion was lacking that Roberts was engaged in

11  any criminal activity or armed and dangerous.

12      It is clear, that during the initial encounter Officer Griffin attempted to engage Roberts in a

13  consensual encounter.  Griffin used a polite, conversational tone when she first spoke with Roberts,

14  saying: "Hi, sir.  Can I talk to you for a moment?"  When Roberts questioned why she wanted to talk

15  with him, she explained why she had been called out to the scene – specifically, that the call concerned

16  suspicious activity regarding the vehicle.  It is also clear that Roberts repeatedly questioned why she

17  wanted to talk with him, and challenged her authority.  The encounter between Griffin and Roberts was

18  not a friendly exchange of pleasantries and information.  Griffin repeatedly attempted to get Roberts to

19  approach her patrol car to speak with her, and to keep his hands out of his pockets.  Roberts verbally

20  challenged Griffin when she asked to speak with him.  However, Roberts did not display an

21  unequivocal unwillingness to engage in conversation with Griffin, nor did Griffin make a show of

22  authority or exert any physical force sufficient to prevent Roberts from leaving.

23      In the minute to one and a half minutes it took for Kingsley to arrive, Roberts at times complied

24  with her requests and at times refused to comply.  Roberts initially took his hands out of his pockets as

25  asked, and turned and started to approach her patrol car.  However, he was hesitant, appeared nervous,

26  kept putting his hands back into his pockets even after being told the reason she wanted his hands out of

27  his pockets was for her safety, looked at the ground, and would not make eye contact with her.

28  Although Roberts turned and started to approach her patrol car, he hesitated and walked so slowly that

1  in the minute to one and a half minutes which elapsed before Kingsley arrived, Roberts had only

2  walked a distance of approximately fifteen feet.  By the time Kingsley arrived, one to one and half

3  minutes after Griffin's initial encounter with Roberts, her requests had converted to commands.

4       The court finds Roberts was not seized for purposes of the Fourth Amendment until after

5  Officer Kingsley arrived because Griffin initially requested to speak with Roberts and obtain his

6  cooperation in her investigation.  She asked Roberts to step toward her after observing a bag or other

7  object on the ground near Roberts and the vehicle, and because she could not see all of Roberts.

8  Roberts had his hand in his pocket and was wearing a large, bulky jacket.  He complied with her initial

9  request to please take his hands out of his pockets.  The court finds that when Griffin reiterated that she

10 just needed to speak with him, explained why and told him she wanted him to keep his hands out of his

11 pockets for her safety, she was still attempting to establish a consensual encounter.  It would have been

12 poor police work indeed for Griffin to ignore the 311 call without attempting to investigate the

13 neighbor's report of suspicious activity.  She arrived minutes after the call was made and saw Roberts

14 standing next to the vehicle described at the location described.  She tried to get Roberts to talk with her

15 to maintain the status quo temporarily while obtaining more information.  Griffin's initial conversation

16 with Roberts would not suggest to a reasonable innocent person that compliance with her requests was

17 required.

18      By the time Officer Kingsley arrived, however, Griffin was clearly concerned about Roberts'

19 behavior.  She initially asked, and then commanded Roberts to keep his hands out of his pockets and

20 approach her patrol vehicle.  When Kingsley arrived, he joined her at the front of her patrol car and

21 acted as the cover officer.  Griffin moved from behind the door of her patrol car to the east of Roberts to

22 call in the license plate and asked Roberts whether the vehicle was his.  She also told Roberts she was

23 going to pat him down for weapons.  Roberts responded, "No, you are not going to search," and Griffin

24 responded to his remark by drawing her weapon.  The court finds Griffin's commands, coupled with

25 Kingsley's presence and the tactical position both officers assumed constituted a seizure.  At this point,

26 a reasonable person in Roberts' position would not have felt free to ignore the police presence and go

27 about his business.  He was seized for purposes of the Fourth Amendment.  Roberts' freedom of

28 movement was restrained and a reasonable person in his position would not have felt free to ignore

1   Griffin's commands.  The court must, therefore, determine whether the seizure was reasonable within

2   the meaning of the Fourth Amendment.

3        The court's analysis of the reasonableness of a seizure requires "a careful balancing of the

4   nature and quality of the intrusion on the individual's Fourth Amendment interests against the

5   countervailing governmental interests at stake."  Graham v. Connor, 490 U.S. 386, 396 (1989) (internal

6   quotations marks omitted).  The court finds that balancing these interest weighs in favor of the

7   government's interests in officer safety.  The court finds that Officer Griffin had reasonable suspicion

8   that Roberts was armed and, under the circumstances of the encounter, potentially dangerous to seize

9   him and conduct a pat down of his person.

10        Griffin initiated the encounter with Roberts after being dispatched to respond to a neighbor's

11  report of suspicious activity involving persons around a white Camaro or Firebird.  The neighbor, who

12  identified himself by name and provided his address and cell phone number to the police in a recorded

13  311 call, provided a first hand contemporaneous account of what he viewed as suspicious activity.  He

14  told the dispatcher who relayed the information to Griffin that three to five people were around a white

15  Camaro or Firebird, that they were nervous, that there were at least two men and one woman, dressed in

16  blue jeans, white t-shirts, with baseball caps on backwards, who were coming and going, but he did not

17  know where.  He told the dispatcher that he thought the car was being stripped or that a drug deal was

18  happening.

19        When Griffin arrived, she was alone in a marked patrol car, in uniform and armed.  She saw

20  Roberts next to the vehicle described by the neighbor.  He was not dressed like the persons described by

21  the neighbor who made the report.  In fact, his clothing was distinctly dissimilar to that described.

22  Griffin parked her patrol car approximately twenty feet from where Roberts was standing next to the car

23  after calling in her arrival and providing dispatch with Roberts' description.  She stood behind the open

24  door of her patrol car while making contact with Roberts and attempted to initiate a conversation.  From

25  her vantage point twenty feet away, she saw a bag or some other object on the ground near Roberts and

26  the car.  Griffin testified that she asked Roberts to come toward her because she could not see exactly

27  what was on the ground, and she could not see all of Roberts.  At the time she started talking with

28  Roberts, she had not seen him engage in any criminal wrongdoing.  She saw no evidence that he was

1   stripping the vehicle or engaging in a drug deal.  However, she was also not close enough to determine

2   whether the interior of the car had been stripped, and had not yet had an opportunity to run the license

3   plate to see if the car was reported stolen, or to whom it was registered.

4         When she first made contact with Roberts, she was aware that numerous stolen vehicles had

5   been recovered in this neighborhood.  She was also aware from other officers who patrolled the area

6   that the house where the car was parked and where Roberts was standing was associated with drug and

7   prostitution activity, and that the person who rented the house was a "problem to the area."  It was with

8   this backdrop that she made her initial encounter with Roberts to investigate the neighbor's suspicious

9   activity report involving persons around a car that matched the description of the car next to which

10  Roberts was standing.  Roberts was wearing a large bulky jacket and had his hands in his pockets.

11  Roberts put his hands back in his pockets three or four times as Griffin attempted to talk with him even

12  after Griffin told him that she wanted him to keep his hands out of his pockets for her safety.  Griffin

13  testified that when she initially made contact with Roberts, indicating she wanted to speak with him,

14  Roberts responded, "Why do you have to search me?"  Griffin found this an odd response because she

15  had not indicated at that point that she had any intent to search him, and this remark caused her to be

16  concerned.  During cross examination and in oral argument following the evidentiary hearing, counsel

17  for Roberts suggested that Griffin's testimony and police report indicated that Griffin had expressed an

18  intention to search Roberts from the point of her initial encounter.  Griffin denied she expressed any

19  intent to search Roberts until she explicitly told him she was going to pat him down.  To the contrary,

20  she testified that she found Roberts' response odd, and that it concerned her because she had not said

21  anything about searching him at this point.  The court found this testimony credible.  All of these

22  interactions occurred before Officer Kingsley arrived.

23        Griffin knew from the police dispatcher that three to five people had been around the car,

24  engaging in suspicious activity at the time the neighbor made the report.  The 311 call was made at

25  7:48 a.m.  She estimated she arrived between 7:50 and 8:00 a.m., minutes after the call.  She testified,

26  that she was concerned for her safety because she did not know whether, and if so where, the three to

27  five persons reported were.  Roberts was nervous, looking around, and not listening to her commands.

28  / / /

1    Once Kingsley arrived and acted as the cover officer, Griffin told Roberts she was going to pat

2   him down for weapons.  The court found Officer Griffin credible that when she verbally advised

3   Roberts she was going to pat him down, Roberts told her she was not going to search and then took an

4   aggressive stance by turning his feet at a forty-five degree angle to her, raising his leg and arm toward

5   her.  She responded by drawing her service weapon and grabbing Roberts' arms to handcuff him before

6   conducting the pat down.  The court finds that when Griffin conducted the pat down, she had

7   reasonable suspicion that Roberts was armed and, under the circumstances of this encounter potentially

8   dangerous.  Conducting a pat down of his person for weapons was objectively reasonable under the

9   totality of the circumstances.  When she drew her weapon, Roberts' behavior and the totality of the

10  circumstances surrounding the encounter justified Griffin's fear for her personal safety and did not

11  convert the encounter into an arrest.  When she initiated the pat down, she immediately saw the gun in

12  the right pocket of the jacket where Roberts' hand had repeatedly returned.  The gun was lawfully

13  seized after Griffin developed reasonable suspicion Roberts was armed and potentially dangerous.

14  Suppression of the gun is, therefore, not required.

15        **C.    Roberts' Interrogation**

16       It is undisputed that once Griffin found a weapon, she handcuffed Roberts, placed him under

17  arrest, and advised him of his *Miranda* rights.  It is also undisputed that Roberts acknowledged

18  understanding his rights, and began speaking with her.  Roberts declined to answer one question –

19  where he got the gun.  It is undisputed, however, that after declining to answer this question, he

20  answered Griffin's question about why he had the gun.  Roberts argues, citing Michigan v. Mosley,

21  423 U.S. 96 (1975), that his refusal to answer a single question was an invocation of his right to remain

22  silent, and that Griffin violated his *Miranda* rights when she did not "scrupulously honor" his wish to

23  stop her interrogation.  The record does not support such a finding.  The court finds Roberts received

24  and waived his *Miranda* warnings, declined to answer a single question, but answered the remainder of

25  Griffin's questions.  Griffin did not persist in asking the question he declined to answer.  Rather, she

26  asked a different question which he answered.  The court finds Roberts did not invoke his right to

27  remain silent by declining to answer a single question under the circumstances presented here.

28  / / /

20

**CONCLUSION**

Officer Griffin was dispatched to a residential neighborhood as a result of a neighbor's 311 call of suspicious activity.  She arrived at the location described minutes after the call and saw Roberts standing next to the vehicle described in front of the house that was described.  Roberts was not dressed like the individuals described by the caller, and was not observed engaging in any criminal conduct.  However, it would have been poor police work for Griffin not to attempt to investigate the neighbor's report of suspicious activity.  Griffin parked her patrol car and attempted to engage in a consensual encounter with Roberts to momentarily maintain the status quo and investigate the neighbor's concern.  She was initially polite, conversational, and non-confrontational.  A reasonable innocent person in Roberts' position would not have believed that compliance with her requests was required.

Roberts' behavior, coupled with the totality of the circumstances surrounding this encounter described, *supra*, gave Griffin reasonable grounds to believe Roberts was armed and potentially dangerous.  Griffin asked, and then commanded Roberts to keep his hands out of his pockets and to approach her patrol car.  Roberts did not yield to her show of authority that he keep his hands out of his pockets and was not seized within the meaning of the Fourth Amendment until Officer Kingsley arrived and acted as a cover officer as Griffin walked to the east of Roberts, called in the license plate on the vehicle, and asked Roberts whether the vehicle was his.  Officer Griffin's words and actions, coupled with Officer Kingsley's presence, would have conveyed to a reasonable person in Roberts' position that he was not free to ignore the police presence and go about his business.  He was seized at the time Griffin announced her intention to pat him down for weapons.  However, by this time, Griffin had reasonable suspicion Roberts was armed and potentially dangerous.  The fact that Griffin drew her weapon in response to Roberts' statement that she was not going to search him, and aggressive stance was objectively reasonable and did not convert the stop and frisk into an unlawful arrest without probable cause.  Roberts was arrested on probable cause when Griffin saw and seized the gun in his jacket pocket.

Roberts received and waived his *Miranda* warnings.  Roberts did not invoke his right to remain silent by declining to answer a single question, and Griffin did not violate his right to remain silent by asking him additional questions after Roberts declined to answer one.

For all of the foregoing reasons,

**IT IS THE RECOMMENDATION** of the undersigned United States Magistrate Judge that Roberts' Motion to Suppress Evidence for Fourth Amendment and Fifth Amendment Violations (#18) be DENIED.

Dated this 5th day of January, 2007.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE